# Federal Defenders
## OF NEW YORK, INC.

One Pierrepont Plaza-16th Floor, Brooklyn, NY 11201
Tel: (718) 330-1200 Fax: (718) 855-0760

David E. Patton
*Executive Director and*
*Attorney-in-Chief*

Deirdre D. von Dornum
*Attorney-in-Charge*

May 25, 2018

BY ECF

The Hon. Allyne R. Ross
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re:   *United States v. Thomas J. Miller*, No. (S2) 16 Cr. 570 (ARR)

Your Honor:

This office represents Thomas J. Miller.  I respectfully submit this letter in connection with Mr. Miller's sentencing, currently scheduled for June 12, 2018, at 10 a.m.  On October 11, 2017, Mr. Miller pled guilty pursuant to a plea agreement to three counts of substantive wire fraud, in violation of 18 U.S.C. § 1343.  The third fraud count is defective as to venue, but Mr. Miller has agreed to waive that problem and proceed to sentencing before this Court on all three counts.

For the reasons set forth below, we respectfully urge the Court to impose a sentence below the advisory Guidelines range.  We will be supplementing this submission next week with a number of letters of support that are still being finalized.

## I.     FACTUAL BACKGROUND

### A.     The Luxury Car Exportation "Gray Market"

This prosecution arises out of three automobile transactions for which Mr. Miller was, or was intended to be, a "straw buyer."  The three victims were the true buyers.  All three are, as described below, sophisticated participants in a "gray market" luxury automobile exportation scheme that has come under increasing federal scrutiny in recent years.  *See* Matthew Goldstein, "U.S. Targets Buyers of China-Bound Luxury Cars," *New York Times* (Feb. 11, 2014), *at:* https://dealbook.nytimes.com/2014/02/11/u-s-targets-buyers-of-china-bound-luxury-cars/

(describing recent "broad crackdown on this 'gray market' export business" in light of violations of customs laws and deception of auto dealers).

The scheme involves engaging straw buyers, like Mr. Miller, to purchase luxury cars from dealerships (or from other straw buyers) across the United States and then exporting the cars to overseas markets where they can be sold at a substantial markup. *See id.* "[S]traw buyers . . . are paid a few hundred dollars to show up at a dealership with a certified bank check to buy a car and then quickly turn over the vehicle." *Id.*

The point of using straw buyers is to deceive the dealership into believing the car is for domestic use. *Id.* Luxury car dealerships have strict restrictions on the number of cars they can sell for export. These restrictions are policed by the manufacturers, whose bottom line is affected by the sort of arbitrage engaged in by the exporters in this case. Those exporters used Mr. Miller as a middleman because they themselves are not permitted to buy from retail dealers.

**B.      The Offense Conduct**

Typically, in a car export case, the government is focused on the exporters, who "do not say that they intend to ship the newly purchased cars overseas," and thus are commonly in violation of customs laws, international tax laws, and car dealership policies. *Id.* In this prosecution, the government has taken the exporters' side. It has chosen to focus its resources on Mr. Miller, who has pleaded guilty to fraudulently failing to deliver cars he contracted to buy on the exporters' behalf.

For example, the government's discovery reflects that Mr. Miller and Modern Motors, the car dealer company at issue in Count One, had a straw-buyer agreement pursuant to which a Modern Motors agent would go with Mr. Miller to a retail dealership, Mr. Miller would purchase the car, and the Modern Motors agent would pay for the car, pay Mr. Miller his commission, and drive away with the car. (*See, e.g.*, Def's Motion In Limine, Ex. A (claim letter discussing this purchase and commission arrangement)). Indeed, Mr. Miller and the Modern Motors agent attempted to consummate this agreement at two different dealerships. (*Id.*). However, as is common in this market, the dealerships refused to sell, apparently because they suspected that the true buyer intended to export the cars.

Ultimately, of course, Mr. Miller kept the money for himself, and has pled guilty to wire fraud in that regard. But Modern Motors was no babe in the woods. It appears to have been well aware that its business model depended upon straw buyers who might keep the money—that is why it sent its agent to accompany Mr. Miller to each of the dealerships. When that didn't work, the government's 3500 material reflects that Modern Motors hired a Mafia-connected debt collector to compel Mr. Miller to cough up the money: text messages with the debt collector reflect his demands for "a envelope with 4500$ cash in it" and in return "you take TJ," who the collector had been "paid . . . to kidnap." When Modern Motors attempted to renege on the deal, the debt collector threatened, "I collect money for the mob that's my job."

Moreover, Mr. Miller's text messages with the second victim, the automobile exporter TFXY USA, Inc., reflect that the car at issue in that deal was to be supplied by Modern Motors

(*see also* PSR ¶ 14), which appears to have continued its business relationship with Mr. Miller notwithstanding his nonpayment of the funds discussed above.  The texts also reflect that TFXY used "the same warehouse" in which the Modern Motors vehicle was stored, and that the idea was simply to change ownership of the vehicle so TFXY could then proceed to export it to China.

The point is that all the victims in this case[1] were sophisticated players who themselves were participants in a scheme to defraud or evade the strict export restrictions of domestic car dealerships.  That fact bears substantially on Mr. Miller's relative culpability.

### C.      Mr. Miller's History And Characteristics

Mr. Miller is a complicated person.  On the one hand, he has been a participant in the export gray market for several years.  He has one prior state conviction for theft by unlawful taking and theft by deception, for which he was sentenced to three years in custody, in connection with similar purchase and sale schemes involving luxury cars.  (PSR ¶ 38).

This pattern appears to have been fueled by Mr. Miller's gambling habit.  The evidence in this case provided numerous examples of what the government referred to as "money laundering," but which was really, at bottom, Mr. Miller using whatever money he could to gamble.  As discussed below and in the government's trial submissions, Mr. Miller's gambled thousands of dollars at a time just as soon as the money hit his account.  He appears to have a serious problem, which may be compounded by bipolar disorder or similar mental health issues.  (PSR ¶¶ 65-68).

The problem is likely hereditary.  Mr. Miller's father "abused cocaine and alcohol, and gambled on a daily basis, playing cards and placing sports bets."  He also abandoned the family for months at a time.  When he was present and sober, however, Mr. Miller and his father shared a close relationship, and Mr. Miller was devastated when his father died.  (PSR ¶ 55; *see also* PSR ¶ 60 (Mr. Miller's grandmother reported that the death was "devastating" for him "and led him not to care for himself and to make bad decisions")).  The father's influence appears to have been a substantial factor in Mr. Miller's offense conduct.

On the other hand, there is every sign that, if Mr. Miller focused his energies more positively, he could be a very successful businessman.  For two years starting when he was only 19 years old, Mr. Miller ran his own profitable and legitimate auto-leasing business.  (PSR ¶ 79).  He also worked in sales at a car dealership in New Jersey, and was promoted to a managerial position until he left to start another leasing business.  (PSR ¶ 78).   We are aware of no misconduct in connection with any of these business (with the exception of a *dismissed* case arising out of a disputed commission (PSR ¶ 49)).

Moreover, while it is fair to say that Mr. Miller had his moments on pretrial release (discussed below), lately things have calmed down.  He has moved back home with his

---

[1] The third victim is discussed in Point II.B *infra*.

grandparents, and, as the letters of support will attest, he has reconciled with his mother—a significant testament to Mr. Miller's efforts to rehabilitate himself, in light of his mother's refusal to sign for his bail at the outset of this case.  Mr. Miller spends a significant amount of time caring for his elderly grandfather, the closest person in his life.

But what Mr. Miller has not been able to do is find real work.  His work life has been spent in the car business, and Pretrial has not approved the job offers he has received in that field.  Most other office work is out of bounds for him because of his record and his pending sentence.  He has most recently been working occasionally on a fishing boat to contribute as best he can to the family budget.

## II.   APPLICABLE SENTENCING LAW

### A.   The Court May Impose A Non-Guidelines Sentence

A sentencing court is required to consider the factors set forth in 18 U.S.C. § 3553(a) in determining a reasonable sentence in each individual case.  *See United States v. Booker*, 543 U.S. 220 (2005); *Gall v. United States*, 552 U.S. 38, 49-50 (2007).  Section 3553(a) directs that "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in Section 3553(a)(2)]," which in turn sets forth that the applicable purposes are:

(A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B)   to afford adequate deterrence to criminal conduct;
(C)   to protect the public from further crimes of the defendant; and
(D)   to provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner.

To arrive at such a sentence, the Court is further directed to consider these additional factors set forth in Section 3553(a): (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range established; (5) pertinent policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentencing disparities among similarly situated defendants; and (7) the need to provide restitution.  In every case, the sentencing court "must make an individualized assessment based on the facts presented."  *Gall*, 552 U.S. at 50.

Plainly, the Guidelines range is just one of several factors set forth in Section 3553(a) that a district court must consider when imposing sentence.  *See also Pepper v. United States*, 131 S. Ct. 1229, 1241 (2011).  A sentencing court "has broad latitude to 'impose either a Guidelines sentence or a non-Guidelines sentence.'"  *United States v. Rigas*, 583 F.3d 108, 114 (2d Cir. 2009) (citation omitted).

4

**B.     The Correct Guidelines Calculation Yields An Advisory Range of 24-30 Months**

Mr. Miller stipulated in his plea agreement to a loss amount and restitution award of $290,000.  The defense therefore agrees that the base offense level is 7 pursuant to U.S.S.G. § 2B1.1(a)(1), and there is a 12 point upward adjustment because the stipulated loss amount is greater than $250,000, pursuant to § 2B1.1(b)(1)(G).  However, the defense disagrees with the PSR's remaining calculations.

1.      The PSR includes a two-point upward adjustment for aggravating role pursuant to U.S.S.G. § 3B1.1(c), on the theory that Mr. Miller "directed the participation of at least one other individual involved in the scheme, specifically, Darryn Clark received a [approximately $120,000] wire transfer from one of the victim[]s on the defendant's behalf and was allowed by the defendant to keep $40,000 of the wire in return."  (PSR ¶ 20).  But the only evidence of that purported profit-sharing arrangement was a statement of Clark himself to a debt collector attempting to get the money back.  (*See* Gov't Motion In Limine 7-8).  This cannot be credited. Clark is a proven liar, and he had an obvious incentive to minimize his own take to a debt collector.  (*See* Defense Motion In Limine 8-9 (explaining that Mr. Clark has pleaded guilty to defrauding a life insurance company of $249,032.45 one month before the transfer)).

Moreover, the only objective evidence is not consistent with Mr. Clark profiting only by $40,000.  The government concedes that Clark himself withdrew $100,000 from his account "in a matter of days" after the transfer.  (Gov't Motion In Limine 7).  The *only* proffered evidence that Mr. Miller himself got any of this money—which is circumstantial indeed—is that Mr. Miller used approximately $40,000 in cash to gamble in Atlantic City in the days after the transfer was completed.  That is consistent with the $40,000 cut going to Mr. *Miller*, not Mr. Clark.

Because there is no credible evidence that Mr. Miller profited more than Mr. Clark from the TFXY transfer, and the objective evidence in fact suggests that he got a smaller take, there is no basis for the PSR's conclusion that Mr. Miller was an organizer or leader of the scheme.  Nor has the defense seen any evidence that Mr. Miller "directed" Mr. Clark to do anything.  To the contrary, the two appear to have been nothing more than partners, each playing different key roles—*i.e.*, Mr. Miller making the arrangements for the transfer, and Mr. Clark supplying the bank account.  The aggravating role enhancement, by contrast, is intended to address "concerns about *relative* responsibility."  3B1.1 background note (emphasis added).  It is inappropriate in these circumstances, and should not be applied.

2.      The PSR also includes a two-point upward adjustment for substantial financial hardship pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(iii) on the ground that Count Three victim Victor Kutsevich lost "all of [his] savings and emergency fund."  It appears this assertion comes from Kutsevich's own loss claim, but it is not credible, and it cannot be squared with the existing record.

As the PSR itself observes, the deal arose because Kutsevich was trying to purchase *two Range Rovers* (PSR ¶ 17)—hardly the economic behavior of a man who is down to his last nickel.  Moreover, the discovery in the underlying Essex County, New Jersey case reflects that the $50,000 Kutsevich paid out was only partial payment for contemplated deal, which means that Kutsevich had significantly more cash on hand to consummate the transaction.  Indeed, in Kutsevich's own voluntary statement to law enforcement, he acknowledged that the "balance" he was going to pay when he picked up just one of the vehicles was "$56,000."  (Cedar Grove Police Voluntary Statement at 2).

Kutsevich also freely acknowledged to the police that he was himself in the business of buying vehicles for export, that his plan was "to resell [the Range Rover] to another dealer in California to make some money . . . and then he would probably resell it again [overseas]," and that Kutsevich tried to do the deal with Mr. Miller because "Land Rover will not sell you more than one vehicle per household and it's very difficult to buy one, they run a lot of background checks to make sure you are not exporting them."  (*Id.* at 3).  On his own account, Kutsevich is a savvy operator in the car exportation business—not the vulnerable victim he has portrayed himself to be to Probation.  The two-point enhancement for substantial financial hardship is inappropriate.

3.      The PSR also recommends denying *any* acceptance points because it alleges that Mr. Miller continued to be involved in "fraudulent conduct" that was "similar in nature to the conduct underlying the offense."  (PSR ¶ 24).  But the PSR identifies no such "similar" conduct.  Rather, the PSR points to a financial disagreement that arose between Mr. Miller and his former employer Boards and Beams, involving disputed merchandise and other items worth approximately $13,000.  The dispute has since been resolved and no charges were filed.  (PSR ¶ 41).  The PSR also explains that one of Mr. Miller's suretors used the financial dispute as "leverage" against him to pay back an unrelated debt.  (PSR ¶ 42).

Neither of these disagreements is material to Mr. Miller's acceptance of responsibility for the instant offenses.  Neither involved duping third parties of their money, neither was fraudulent, and neither involved a car sale transaction.  Rather, even seen in the worst light, they appear to have been failures by Mr. Miller to perform certain employment duties or on other financial agreements—the PSR does not cite any evidence suggesting that Mr. Miller intended to make off with a stranger's money under false pretenses.  To the contrary, the money has been paid back, and Mr. Miller was at the time of the conduct (and, in the case of his suretor, still is) in continuing relationships with each of these purported "victims."

The PSR also ignores the most salient fact about Mr. Miller's acceptance of responsibility: he pled guilty to counts involving all the three of the charged victims, even one whose prosecution was defective in this District because the crime was out-of-venue.  He did so even while two state cases were pending against him for these offenses.  That is a powerful

reason to conclude that Mr. Miller has accepted responsibility for his conduct.  The Court should apply the three-point downward adjustment for acceptance of responsibility.

4.      Finally, the PSR calculates the restitution loss as $294,630, but this figure is greater than the amount stipulated by the parties, and includes "$3,630 in other expenses related to the investigation or prosecution of the offense" by Modern Motors.  (PSR ¶ 21).  It is not clear whether such expenses were "necessary" to the investigation or prosecution, *see* 18 U.S.C. § 3663A(b)(4), or whether they are "sufficiently documented," *United States v. Amato*, 540 F.3d 153, 162 (2d Cir. 2008) (memorandum of law firm supported by "228 pages of invoices and other documents detailing the costs involved").  Indeed, Probation appears to have received only a single "affidavit of loss" from Modern Motors (the same entity employed a mob-connected kidnapper to get its money back from Mr. Miller).  That is insufficient.  The Court should stick with the stipulated restitution amount.

*      *      *

For the reasons set forth above, the correct Guidelines calculation has an adjusted offense level of 19 (*i.e.*, the base offense level plus the stipulated loss amount), and a three-point downward adjustment for acceptance of responsibility, for a total offense level of 16.  Because Mr. Miller is in Criminal History Category II (PSR ¶ 40), the resulting advisory range is 24-30 months.

## C.      The Fraud Guidelines Are Inflated Under Any Analysis

Even the correctly calculated Guidelines range is inflated, however.  As discussed above, Mr. Miller's adjusted offense level is principally determined by plugging the stipulated loss amount into the Guidelines' fraud loss tables.  These tables generate identical offense level increases by loss amount for all applicable fraud crimes, without regard to the seriousness of the offense or the defendant's culpability.

There is no rational basis for this approach to sentencing.  *See, e.g.*, Kate Stith, The Arc of the Pendulum: Judges, Prosecutors, and the Exercise of Discretion, 117 Yale L.J. 1420, 1476 n.235 (2008) ("[T]he Guidelines' 'loss'-penalty tables appear to have been created out of whole cloth, without either statutory or empirical basis.  The great weight the Guidelines attached to quantity has been devastatingly criticized, and nowhere explained." (citations omitted)); *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004) (Lynch, J.) (describing the amount of loss as a "relatively weak indicator of the moral seriousness of the offense or the need for deterrence"); *United States v. Adelson*, 441 F. Supp. 2d 506, 515 (S.D.N.Y. 2006) ("patently absurd" calculations under fraud Guidelines require the court "to place greater reliance on the more general considerations set forth in section 3553(a), as carefully applied to the particular circumstances of the case and of the human being who will bear the consequences"), *aff'd*, 301 F. App'x 93 (2d Cir. 2008).  As Judge Underhill recently observed, there now is a "widespread perception that the loss guideline is broken."  *United States v. Corsey*, 723 F.3d 366, 378 (2d Cir. 2013) (Underhill, J., concurring)

This case illustrates the problem with the loss tables' approach. It fails to distinguish Mr. Miller, who caused loss to sophisticated participants in a gray-market exportation arbitrage scheme, from defendants who simply stole the same amount from truly vulnerable victims, or who ran a Madoff-style Ponzi scheme. The resulting Guidelines range irrationally treats the loss in this case as equal to that caused by these much more serious crimes.

For these reasons, the advisory Guidelines range should be afforded significantly less weight in the sentencing calculus.

## III.    A BELOW-GUIDELINES SENTENCE IS SUFFICIENT

The individual circumstances of Mr. Miller's case warrant a sentence below the advisory range of 24-30 months. Such a sentence, coupled with a term of supervised release where Mr. Miller can rejoin the work force under the supervision of Probation and a mental health professional, is sufficient, but not greater than necessary, to serve the purposes of sentencing.

I respectfully submit that the seriousness of the offense, and the sentencing range advised by the fraud Guidelines, are of relatively lesser concern in this case. Mr. Miller's fraud did not hurt vulnerable victims. He took money from sophisticated commercial players who themselves were the primary participants in a larger fraudulent scheme. As discussed above, those operators used shady tactics to try to collect their own debts before involving the authorities, and have falsely portrayed themselves as financially desperate to Probation. Yet the fraud Guidelines treat their loss equivalently to more morally deserving victims.

Even so, each of the victims will get their money back, no matter what. Mr. Miller has agreed to make full restitution, and, what is more, to an equivalent forfeiture amount on top of that. The total amount is more than half a million dollars, which means that, even after Mr. Miller leaves prison, he will be likely working off a substantial judgment for years.

Of course, the Court's sentence must ensure that the goal of deterrence is served. But the least cost avoider in the automobile exportation scheme is not the straw buyer like Mr. Miller. Rather, it is the corporate exporters themselves, the true buyers, who should be punished, or fined, so their market is no longer profitable. Seen in this context, deterrence of satellite players like Mr. Miller is of lesser moment.

Rather, the issue of most concern to the Court should be Mr. Miller's own characteristics. The question before the Court is: what kind of sentence will motivate Mr. Miller particularly to continue to try to rehabilitate himself, and to, eventually, rejoin the work force as the legitimate business-person he has shown he can be?

The answer, we submit, is that even if the Court concludes that individual deterrence and punishment requires a jail sentence (which we submit should be below the advisory Guidelines range in any event), Mr. Miller should then be permitted to work in the automotive world in some capacity while he is on supervised release. That is where Mr. Miller's skills lie as a business person. Coupled with mental health treatment for his gambling problems, and intensive surveillance by Probation, such a job would allow Mr. Miller to begin to pay down the

substantial financial penalty he must work off for the foreseeable future, and, more importantly, to try to rebuild a legitimate life for himself.

Respectfully submitted,

/s James Darrow

James Darrow
Assistant Federal Defender
Federal Defenders of New York, Inc.
Tel. (718) 407-7419
Fax: (718) 855-0760
james_darrow@fd.org

*Attorneys for Thomas J. Miller*

cc:     U.S. Probation Officer Jennifer G. Fisher (by email)
        Counsel of record (by ECF)