

U.S. Department of Justice

United States Attorney
Eastern District of New York

TAD:ELM
F. #2016R00595

271 Cadman Plaza East
Brooklyn, New York 11201

June 5, 2018

By ECF

The Honorable Allyne R. Ross
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

    Re: United States v. Thomas Miller
       Criminal Docket No. 16-570 (ARR)

Dear Judge Ross:

  The government respectfully submits this letter in advance of the defendant's sentencing, which is scheduled for June 12, 2018 at 11:00 a.m. For the reasons set forth below, the government respectfully submits that the United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G.") range set forth in the Presentence Investigation Report dated March 22, 2018 (the "PSR") is correct, and respectfully requests that the Court impose a sentence within the Guidelines range.

  The government also responds to the defendant's sentencing memoranda and objections to the PSR, dated May 25, 2018 (the "Def. Sent. Memo") (ECF No. 86), in which: (1) the defendant objects to the Guidelines calculation set forth in the PSR; (2) asserts that the correct Guidelines range is 24 to 30 months; and (3) requests a sentence below the Guidelines range calculated in the PSR.

I. Factual Background

  A. The Offense Conduct

  On October 11, 2017, the defendant pled guilty to three counts of wire fraud: Counts One, Two and Three of a fourteen-count superseding indictment. (PSR ¶ 1). In each of these counts, which are described in more detail below, the defendant induced victims to send him money by falsely representing that he would convey ownership of certain luxury vehicles in return. In each case, the defendant did not provide the promised vehicles, and

refused to return the money. In total, the defendant defrauded his victims of approximately $290,985. (PSR ¶ 5).

### i. Count One: The Modern Motors Scheme

Between May 2015 and January 2016, the defendant engaged in a scheme to defraud Modern Motors, a California-based automotive dealer. (PSR ¶ 5). On May 11, 2015, based on an advertisement for a black Range Rover that the defendant posted on a car sale website, Modern Motors wired approximately $120,000 to a bank account in the defendant's name. (PSR ¶ 7). That same day, the defendant and a representative of Modern Motors signed a bill of sale representing that the defendant owned the black Range Rover. (PSR ¶ 8). In fact, a car dealership in New Jersey owned the Range Rover. (PSR ¶ 9).

An employee of Modern Motors flew to New Jersey – where the defendant resided – to ensure the transaction was completed. (PSR ¶ 8). After the employee arrived, he and the defendant obtained a cashier's check in the amount of approximately $103,000. (PSR ¶ 9). The check was meant to be used to purchase the black Range Rover from a New Jersey-based car dealership, and the defendant was expected to keep the remaining $17,000 as his commission. (Id.) However, the dealer refused to sell the Range Rover without a one-year lien, in order to prevent the car from being exported. (Id.) Modern Motors declined to complete the purchase under those terms, but the defendant did not return the money. (PSR ¶ 10).

Instead, the defendant offered to purchase two other Range Rovers from a dealership based in Las Vegas, Nevada. (PSR ¶ 10). On May 12, 2015, the defendant purchased plane tickets to Las Vegas for himself and the Modern Motors employees, departing from John F. Kennedy International Airport in Queens, New York. (Id.) The defendant did not complete the sale of the two Range Rovers, so he and Modern Motors entered into a second agreement on May 13, 2017. (Id.) Under the terms of this agreement, the defendant agreed that he would use the $120,000 payment from Modern Motors to purchase a Range Rover within 48 hours, and, if not, he agreed to refund the payment. (Id.) The defendant did neither.

On May 21, 2015, after he had returned to New Jersey, the defendant deposited the $103,000 cashier's check into his bank account. (PSR ¶ 11). He then transferred approximately $108,000 from his bank account to a bank account associated with his business, Tru Lease. The defendant then transferred $85,000 from the Tru Lease bank account to the Hard Rock Hotel and Casino in Las Vegas (the "Hard Rock"). (Id.) The defendant then flew to Las Vegas and gambled with tens of thousands of dollars at the Hard Rock. (Id.) He also withdrew at least $147,000 in cash from the Hard Rock. (Id.) Modern Motors repeatedly contacted the defendant after he failed to deliver any vehicles, but the defendant refused to return the money. (Id.)

In September 2015, the defendant offered to assist Modern Motors in selling two cars that were parked at a New Jersey port: a Range Rover and a Mercedes Benz. (PSR

2

¶ 12). The defendant never sold the cars, and he never returned the $120,000 payment from Modern Motors. (Id.)

### i. Count Two: The TFXY Scheme

On October 9, 2015, an employee of TFXY, a New York-based automotive dealer, communicated with the defendant via text message about a Range Rover and Mercedes Benz for sale – the same vehicles that the defendant had agreed to sell for Modern Motors in September 2015. (PSR ¶¶ 5, 13). The defendant agreed to sell TFXY the Range Rover for approximately $120,985, and sent TFXY a signed bill of sale for the car. (PSR ¶¶ 13, 14).

Upon instruction from the defendant, TFXY wired $120,985 to a bank account in the name of "Clark Power Washing and Painting," an entity associated with Darryn Clark (the "Clark Account"). (PSR ¶ 14). Although the bank records indicated that the wire had cleared, the defendant claimed that the wire had not gone through. (Id.) The defendant identified Clark as his business partner. (PSR ¶ 14). Shortly after the TFXY wire was deposited, Clark withdrew $100,000 from the Clark Account. (Id.) The Clark Account had a zero balance by early November 2015. (Id.)

On October 26, 2015, Clark told an employee of a debt collection agency that he had agreed to accept a wire on the defendant's behalf. (PSR ¶ 15). According to Clark, the defendant stated that he would allow Clark to keep $40,000 in exchange for receiving the wire from TFXY. (Id.)

The TFXY employee contacted the New Jersey port facility where the Range Rover was located, and learned that the car was owned by Modern Motors. (PSR ¶ 15). TFXY never received the Range Rover, and the defendant never returned the $120,985 payment. (Id.)

### ii. Count Three: The Kutsevich Scheme

In November 2015, Viktar Kutsevich, a Virginia resident, contacted the defendant by phone in response to the defendant's online post offering Range Rovers for sale. (PSR ¶ 17). The defendant induced Kutsevich to wire him five payments totaling $50,000 between November 17, 2015 and December 30, 2015, as a deposit for two Range Rovers. (PSR ¶¶ 17, 18). After receiving the wires from Kutsevich, the defendant gambled tens of thousands of dollars at the Borgota Hotel Casino & Spa in Atlantic City, New Jersey. (PSR ¶ 19).

The defendant and Kutsevich entered into a purchase agreement for the cars, which identified the seller as "Joseph P. Malone," and the defendant provided Kutsevich with a driver's license in the name of "Jospeh P. Malone." (PSR ¶ 18). The defendant repeatedly delayed the sale, and told Kutsevich that another individual, "Dan Lee," had control of the cars. (PSR ¶ 18). When Kutsevich told the defendant that deal was off in

3

January 2016, the defendant told Kutsevich that he would have to obtain a refund from "Lee." (PSR ¶ 19). Kutsevich never received a refund from "Lee" or the defendant.

### B. The Defendant's Criminal History

In 2012, the defendant was convicted of theft by unlawful taking in the third degree and theft by deception in the third degree in New Jersey Superior Court. These convictions arose from a "pattern of fraud" in which the defendant received money from victims for the purpose of purchasing a car, but never provided the vehicle or returned the money. (PSR ¶ 38). The defendant received the following payments from victims in connection with this pattern:

- August 7, 2008 wire for $74,120;
- December 15, 2009 wire for $54,000;
- December 15, 2009 wire for $73,050;
- February 22, 2010 wire for $30,000;
- April 28, 2010 wire for $93,000;
- June 24, 2010 wire for $3,000;
- October 28, 2010 wire for $6,500;
- November 20, 2010 wire for $64,000; and
- December 29, 2010 wire for $75,700.

(PSR ¶ 38.) The defendant never delivered the vehicles he promised in exchange for these payments. (Id.) For his conduct, the defendant was sentenced to 3 years' imprisonment on January 20, 2012. (Id.)

### C. The Defendant's Conduct on Pretrial Release

On or about October 26, 2016, the defendant was arrested and arraigned in connection with the above-referenced matter. (ECF No. 4). On November 11, 2016, the defendant was released on $400,000 bond, signed by four sureties, and was subject to location monitoring and a curfew. (ECF No. 13; Release Order, ECF No. 14). The defendant failed to comply with the conditions of his release by repeatedly violating his curfew and committing new crimes, specifically new fraudulent activities.

In July 2017, the defendant did not return home after attending a wedding, and lied to his supervising officer about his location during the time at issue. (PSR ¶ 61). As a result, the defendant's release conditions were modified to include strict home confinement. (Id.) The defendant's conditions were later modified to include a curfew. (Id.) The defendant's curfew was again adjusted (to an earlier time) because of his repeated lateness. Despite these repeated modifications of the conditions of his supervision, the defendant continued to return home past his curfew. (Id.)

While he was on pretrial supervision, the defendant was employed by a retail business, Boards and Beam. (PSR ¶ 75). According to a police report filed by the owner of

Boards and Beam, the defendant committed a series of three frauds against the company during his term of employment. (PSR ¶ 41). The owner alleged that the defendant used his own, separate online business – Wood Guru – to obtain money and merchandise from Boards and Beam. (Id.) In the first scheme, the defendant sold approximately $12,000 worth of merchandise belonging to Boards and Beam, and never paid the store for its goods. (Id.) In the second scheme, the defendant purportedly donated merchandise from Boards and Beam to a charity, but in fact kept an unknown portion of the "donation" for his own use. (Id.) Finally, in the third scheme, the defendant agreed to organize a trade of merchandise from Boards and Beam in exchange for company t-shirts. (Id.) Instead, the defendant obtained the t-shirts and kept the goods for his own use, leaving the company to cover the cost of the t-shirts, over $800. (Id.)

According to the owner of Boards and Beam, the defendant repaid the company for most of the money it lost due to his fraudulent conduct. (PSR ¶ 42). The company's owner did not pursue charges against the defendant, in large part because the defendant was making payments in the amount of $500 per week to the owner's nephew. (Id.) The owner indicated that his nephew provided the defendant with approximately $48,000 in order to purchase an investment property. (Id.) The defendant did not purchase any property, and kept the money for himself. (Id.) The owner of Boards and Beam told the Probation Department that he used the evidence he had against the defendant as "leverage" to induce the defendant to repay his nephew. (Id.) Currently, the defendant still owes the owner's nephew approximately $10,000. (Id.)

## II. The Legal Standard for Sentencing

In United States v. Booker, 125 S. Ct. 738, 743 (2005), which held that the Guidelines are advisory, the Supreme Court made clear that district courts are still "require[d] . . . to consider Guidelines ranges" in determining a sentence, but also may tailor the sentence in light of other statutory concerns. See 18 U.S.C. § 3553(a). After Booker, the Second Circuit held that "sentencing judges remain under a duty with respect to the Guidelines . . . to 'consider' them, along with the other factors listed in section 3553(a)." United States v. Crosby, 397 F.3d 103, 111 (2d Cir. 2005).

In Gall v. United States, 128 S. Ct. 586 (2007), the Supreme Court elucidated the proper procedure and order of consideration for sentencing courts to follow: "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall, 128 S. Ct. at 596 (citation omitted). Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing he may not presume that the Guidelines range is reasonable. He must make an individualized assessment based on the facts presented." Id. at 596-97 (citation and footnote omitted).

5

III.        The Guidelines Calculation

The PSR calculates the defendant's offense level to be 23, as outlined below:

| | |
|---|---|
| Base Offense Level (U.S.S.G. § 2B1.1(a)(1)) | 7 |
| Plus: Loss Greater Than $250,000 (U.S.S.G. § 3B1.1(c)) | +12 |
| Plus: Substantial Financial Hardship (U.S.S.G. § 2B1.1(b)(2)(A)(iii)) | +2 |
| Plus: Aggravating Role (U.S.S.G. § 3B1.1(c)) | +2 |
| Total: | 23 |

(PSR ¶¶ 27-36.)

Based on a total offense level of 23 and a Criminal History Category of II, the advisory Guidelines range is 46 to 57 months. (PSR ¶ 88).

The parties' plea agreement calculated a total offense level of 21 and a Criminal History Category of II, and noted that a 2-level reduction would be warranted, pursuant to U.S.S.G. § 3E1.1(a) "[i]f the defendant clearly demonstrates acceptance of responsibility, through allocution and subsequent conduct prior to the imposition of sentence." (See Government Ex. 1, ¶ 2). The plea agreement provided an estimated Guidelines range of 33-41 months and an appellate waiver of 41 months. (See Id.)

The defendant objects to the range calculated in the PSR. Specifically, he objects to the application of the enhancements related to one of the victims (who suffered a substantial financial hardship) and for the defendant's aggravating role in the offense. The defendant also argues that he should receive a three-point decrease because his guilty plea demonstrated his acceptance of responsibility for his conduct. The defendant does not contest that his Criminal History Category is II.

        A.    The Aggravating Role Adjustment Is Appropriate

The defendant is subject to the two-level increase for his aggravating role pursuant to U.S.S.G. § 3B1.1(c).[1] (PSR ¶ 20). This increase is based upon the defendant's direction of Darryn Clark, who received a $120,000 wire from TFXY in connection with the fraudulent scheme charged in Count Two. The defendant objects, arguing that "[b]ecause

---

[1] The estimated Guidelines calculation outlined in the parties' plea agreement includes a two-level increase for the defendant's aggravating role in the charged fraudulent schemes. (See Government Ex. 1, ¶ 2).

6

there is no credible evidence that Mr. Miller profited more than Mr. Clark from the TFXY transfer, and the objective evidence in suggests that he got a smaller take, there is no basis for the PSR's conclusion that Mr. Miller was an organizer or leader of the scheme." Def. Sent. Memo, pg. 5. The defendant characterizes his relationship with Mr. Clark as one between "partners," with the defendant arranging for the transfers and Clark providing a bank account to receive those transfers. (Id.) There is no indication that anyone besides the defendant and Clark were involved in any of the charged conduct. (Id.)

The defendant was responsible for initiating the fraud against TFXY, providing TFKY with the details of the Clark Bank Account, and directing TFKY to deposit fraudulently obtained funds into the Clark Bank Account. Clark had no contact with TFKY, and Clark had no role in inducing TFXY to deposit any money into the Clark Bank Account. Additionally, Clark was involved in only one of the three counts of wire fraud to which the defendant pleaded guilty.[2] The defendant actively used the Clark Bank Account to facilitate his fraudulent scheme. The defendant and Clark were not partners. The defendant induced Clark to allow him to use the Clark Bank Account in exchange for $40,000 – the use of the Clark Bank Account was the beginning and end of Clark's involvement in the TFXY Scheme. The defendant was the mastermind and driving force behind the TFXY Scheme, and, unlike Clark, his involvement was integral to the completion of the scheme. Therefore, the Court should impose a two-level increase for the defendant's aggravating role in the TFXY Scheme.

B. The Substantial Financial Hardship Adjustment May Be Appropriate

Under the Guidelines, a defendant whose fraud results in a substantial financial hardship to at least one victim is eligible for a two-level increase. U.S.S.G. § 2B1.1(b)(2)(A)(iii). In evaluating whether a victim has suffered a substantial financial hardship, the Court should consider, among other things, whether "the offense resulted in the victim … suffering substantial loss of a retirement, education, or other savings or investment fund." U.S.S.G. § 2B1.1, Application Note 4(F)(iii). The PSR concludes that this adjustment is appropriate because the defendant's fraud led to "the loss of all of Kutsevich's savings and emergency fund." (PSR ¶ 20). This conclusion is based upon Kutsevich's representations to the Probation Department. (Id.)

The defendant contends that Kutsevich could not have suffered a financial hardship because he was "a savvy operator in the car exportation business" who intended to purchase and resell two Range Rovers. Def. Sent. Memo, pg. 6. The defendant argues that this plan is "hardly the economic behavior of a man who is down to his last nickle" and notes that, had the deal been completed, Kutsevich would have provided an additional payment of approximately $56,000. Id.

---

[2] Additionally, the defendant was charged with four additional counts of wire fraud as to Kutsevich. Clark was not involved in any of those fraudulent wires.

7

The fact that Kutsevich was involved in the exportation of automobiles does not matter. The defendant does not dispute that Kutsevich lost $50,000 due to the defendant's fraud. This amount is a "substantial loss" for the vast majority of the United States population. Although this enhancement was not included in the parties' plea agreement, the Guidelines range set forth therein was an estimate and "is not binding on the [government], the Probation Department or the Court." Gov. Ex. 1, ¶ 3. The parties' agreement provides that, "[i]f the Guidelines offense level advocated by the [government], or determined by the Probation Department or the Court, is, for any reason, including an error in the estimate, different from the estimate, the defendant will not be entitled to withdraw the plea and the government will not be deemed to have breached this agreement. Id. If the Court concludes that Kutsevich suffered a financial hardship pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(iii), a two-level enhancement is appropriate.

### C. The Defendant is Not Automatically Entitled to Credit for Acceptance of Responsibility

The defendant argues that the Court "should apply the three-point downward adjustment for acceptance of responsibility." Def. Sent. Memo, pg. 7. The defendant is referring to the two-step acceptance of responsibility calculation outlined by U.S.S.G. § 3E1.1. The Guidelines provide for: (a) a two-level decrease "[i]f the defendant clearly demonstrates acceptance of responsibility," and (b) an additional one-level decrease "upon motion of the government stating that the defendant has assisted authorities in the investigation or prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty." U.S.S.G. § 3E1.1. A sentencing court determines whether an individual defendant is eligible for acceptance of responsibility credit, and "[a] defendant who enters a guilty plea is not automatically entitled to an adjustment for acceptance of responsibility." United States v. Ortiz, 218 F.3d 107, 108 (2d Cir. 2000).

#### i. The Court Is Not Required to Apply the Two-Point Decrease Under U.S.S.G. § 3E1.1(a)

The Second Circuit has acknowledged that the "district court may deny a reduction under § 3E1.1 of the Guidelines based on a credibility determination that the defendant has not accepted responsibility for the offense of conviction." United States v. Reyes, 9 F.3d 275, 280 (2d Cir. 1993). In determining whether a defendant qualifies for a two-level decrease for "clearly demonstrat[ing] acceptance of responsibility for his office" pursuant to U.S.S.G. § 3E1.1(a), the Court should consider the defendant's "voluntary termination or withdrawal from criminal conduct or association." U.S.S.G. § 3E1.1(a), Application Note 1(B). As outlined above, the defendant engaged in new fraudulent conduct while he was on pretrial release in this case. Based upon this conduct, the Probation Department concluded that "no acceptance of responsibility reduction under U.S.S.G. § 3E1.1 is warranted in this case." (PSR ¶ 24.) If the Court determines that the defendant's conduct while subject to pretrial supervision evidences a lack of remorse and a failure to sincerely accept responsibility for his crimes, it could reject the defendant's application for a two-level decrease pursuant to U.S.S.G. § 3E1.1(a).

8

The Court must evaluate whether a reduction is appropriate in a case-by-case basis, and "[t]he sentencing court may deny a reduction for acceptance of responsibility under [U.S.S.G.] § 3E1.1 if it determines that 'the defendant has engaged in continued criminal conduct that bespeaks a lack of sincere remorse.'" United States v. Sukkareith, 113 F.3d 1230, 1230 (2d Cir. 1997) (citation omitted) (affirming denial of reduction where defendant committed perjury and received stolen property while on pretrial release); see also Ortiz, 218 F.3d at 108 (affirming denial of acceptance of responsibility decrease in connection with sentencing for conspiracy to distribute crack cocaine where defendant repeatedly violated conditions of bond by using cocaine and marijuana); United States v. Defeo 36 F.3d 272, 277 (2d Cir. 1994) (denial of reduction for acceptance of responsibility supported in part by defendant's conduct on pretrial release, including failure to report to pretrial services, continued use and possession of heroin, and attempt to conceal her heroin usage).

The defendant pleaded guilty to three of the fourteen counts for which he was charged, including Count Three, which had no nexus to the Eastern District of New York. (See Superseding Indictment (ECF No. 65)). As the defendant notes, this fact reflects an acceptance of responsibility for his criminal conduct. However, his actions while on supervised release – including his failure to consistently adhere to his curfew and the commission of new criminal acts – indicates a lack of respect for the Court's release order and a willingness to engage in the same kind of fraudulent conduct that led to this charges against him here. The government submits that the defendant's behavior while on pretrial release, including the commission of new fraudulent criminal conduct, demonstrates his failure to accept responsibility, in light of all of the circumstances surrounding the defendant's plea. In that case, the Court may deny the defendant's application for credit for acceptance of responsibility.

### ii. The One-Point Decrease Under U.S.S.G. § 3E1.1(b) Does Not Apply

The defendant is not eligible for the additional one-level decrease pursuant to U.S.S.G. § 3E1.1(b), and the government will not move for such a decrease. In order to be eligible for the one-point reduction under U.S.S.G. § 3E1.1(b), "the defendant must have notified authorities of his intention to enter a plea of guilty at a sufficiently early point in the process so that the government may avoid preparing for trial." U.S.S.G. § 3E1.1(b), Application Note 6. "Because the Government is in the best position to determine whether the defendant has assisted authorities in a manner that avoids preparing for trial, an adjustment under [U.S.S.G. § 3E1.1(b)] may only be granted upon a formal motion by the Government." Id. (citing Public Law 108-21, Section 408(g)(2)(B)).

The defendant was indicted in this case on November 4, 2016. (ECF No. 10). The grand jury returned a superseding indictment against the defendant on July 7, 2017. (ECF No. 47). On July 14, 2017, the Court scheduled the trial in this matter to begin nearly four months later, on November 13, 2017. (ECF No. 48). The grand jury issued a second superseding indictment against the defendant on September 18, 2017. (ECF No. 65).

The government began to prepare for trial, and filed a lengthy motion in limine concerning trial evidence, as well as proposed jury instructions on September 29, 2017. (ECF Nos. 69, 70). The defendant did not enter his plea of guilty until October 11, 2017 (ECF No. 71) – approximately one month before the scheduled trial date, eleven months after the initial indictment and well after the government had begun its preparation for the trial. In light of the significant time and resources expended by the government to prepare for a November 13, 2017 trial, the government does not intend to seek (and the defendant is not eligible for) the additional one-point decrease under U.S.S.G. § 3E1.1(b). See United States v. Casteneda, 191 Fed. Appx. 15, 17 (2d Cir. 2006) (trial court did not abuse discretion in denying application for one-level decrease under U.S.S.G. § 3E1.1(b) where "government had substantially prepared its case, as indicated by its filing of an in limine motion with respect to certain trial evidence" and the defendant pled guilty three days before trial was scheduled to begin).

In light of the substantial preparations undertaken in connection with the trial scheduled in this case, the government opposes the one-level decrease for acceptance of responsibility under U.S.S.G. § 3E1.1(b). The government's position on this matter was clear when the defendant entered his guilty plea – notably, the parties' plea agreement does not reflect the one-point reduction contemplated by U.S.S.G. § 3E1.1(b). (See Gov. Ex. 1, ¶ 2).

IV. The Appropriate Sentence

In light of the seriousness of the defendant's conduct and his repeated disregard of the law and the conditions of his release, a sentence within the advisory Guidelines range is appropriate to provide just punishment, promote respect for the law and effect adequate deterrence. The defendant repeatedly engaged in fraudulent criminal conduct of the type at issue here since as early as 2008. He was given multiple opportunities to stop committing crimes, including while he was on pretrial release in this very case. He continued to commit new frauds in pursuit of personal financial gain.

The defendant's sentencing submission attempts to minimize the seriousness of his conduct and culpability. The defendant repeatedly argues that his victims were "sophisticated players" and "savvy operator[s]" who were involved in a "scheme to defraud or evade the strict export restrictions of domestic car dealerships." Def. Sent. Memo, pg. 3. The defendant intentionally defrauded his victims out of hundreds of thousands of dollars for his personal gain. Even now, he does not fully acknowledge the harm that his actions had on his victims. Additionally, the defendant's suggestion that his victims should have anticipated or somehow deserved the be defrauded demonstrates that a custodial sentence is necessary to deter him from committing additional crimes.

The defendant's actions also show that a Guidelines sentence is necessary to deter him from committing new crimes. The defendant's criminal conduct, both in connection with the charges here and while on pre-trial supervision, demonstrates that he has not been and will not be deterred from committing new frauds by a below-Guidelines

10

sentence. The defendant was previously sentenced to 3 years' imprisonment for conduct that is strikingly similar to that at issue here. Rather than being deterred by his prior conviction and prison sentence, the defendant committed the new crimes at issue here, defrauding his victims of approximately $290,000 over a seven-month period.

The defendant's conduct on pretrial release further underscores the need for specific deterrence. Despite repeated warnings, modifications and second chances, the defendant repeatedly violated the most basic conditions of his bond by violating his curfew. More seriously, the defendant engaged in additional frauds against his employer while on pre-trial supervision, demonstrating his lack of respect for both the law and this Court.

V. Conclusion

For the foregoing reasons, the government respectfully requests that the Court impose a sentence within the applicable Guidelines range that is sufficient but not greater than necessary to achieve the goals of sentencing.

Respectfully submitted,

RICHARD P. DONOGHUE
United States Attorney

By: /s/ Elizabeth Macchiaverna
Elizabeth Macchiaverna
Assistant U.S. Attorney
(718) 254-6351

cc: James Darrow, Esq. (by email and ECF)
U.S. Probation Officer Jennifer G. Fisher (by email and ECF)
Clerk of the Court (ARR) (by ECF)